**A F F I D A V I T**

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA, to-wit:

I, Wyatt McCabe, being first duly sworn, do hereby depose and state as follows:

## INTRODUCTION

**1.**    I am a sworn Task Force Officer (TFO) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). I am also a Detective with the Charleston Police Department (CPD) and have been so employed since July 2019. I am currently assigned to the ATF Louisville Field Division, Charleston, WV Field Office.

**2.**    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a red in color Apple iPhone, a black in color Apple iPhone, and a white in color Apple iPhone, all three of which are more fully described in Attachment "A," and the extraction from that property of electronically stored information described in Attachment "B."

**3.**    The contents of Attachment "A" and Attachment "B" to this Affidavit and application for a search warrant are hereby incorporated by reference.

**4.**    The facts in this Affidavit come from my personal observations, my training and experience, and information

obtained from other agents, law enforcement officers, and witnesses.

5.    Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause for this warrant.

## STATUTORY AUTHORITY

6.    This investigation concerns alleged violations of federal law, including but not limited to violations of 18 U.S.C. § 922(a)(6) (Making False Statements); 18 U.S.C. § 922(g)(3) (Possession of a Firearm by a Person Who Is an Unlawful User of or Addicted to Controlled Substances); 18 U.S.C. § 924(a)(1)(A) (Providing False Information); 18 U.S.C § 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense); 18 U.S.C. § 932(b) (Straw Purchase of Firearms); 18 U.S.C. § 933 (Trafficking in Firearms); 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance); and 18 U.S.C. § 371 (Conspiracy).

## AFFIANT'S TRAINING AND EXPERIENCE

7.    Your Affiant is currently employed as a Detective with the Charleston Police Department and a TFO with the ATF.

8.    Your Affiant graduated from the West Virginia State Police Academy, where I learned basic criminal investigation techniques.

2

**9.**     Your Affiant has received investigative training, conducted, and participated in investigations of violations of federal criminal laws, including those relating to firearms and controlled substances.  These acts commonly involve the criminal use and transfer of firearms as well as illicit drug trafficking.

**10.**     In my current position as an ATF TFO assigned to the Charleston, WV Field Office, my primary responsibilities include investigating individuals or groups who have committed violations of the federal firearms and narcotics laws.  Within that role, my job duties include, but are not limited to:

   **a.** Functioning as a case agent, which entails the supervision of specific investigations.

   **b.** Interviewing witnesses relative to the illegal trafficking of drugs and firearms and the distribution of monies and assets derived from these illegal acts.

   **c.** Functioning as a surveillance agent observing and recording movements of persons trafficking in drugs and firearms and those suspected of trafficking in drugs and firearms.

   **d.** Drafting, obtaining, and executing search warrants.

## AFFIANT'S KNOWLEDGE OF CELLULAR TELEPHONES AND THEIR USE IN CRIMINAL ACTIVITY

**11.**     Your Affiant is personally, and professionally, familiar with cellular telephones or mobile telephones.

3

12.    I know that a cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communications between parties in remote locations.

13.    I am aware that cellular telephones usually include a "call log," which records the telephone number, date, and time of calls made to and from the phone.

14.    In addition to enabling voice communications, I know that cellular telephones now offer a broad range of functions, which include, but are not limited to: storing names and phone numbers in electronic address books or contact lists; sending, receiving, and storing text messages and emails; taking, sending, receiving, and storing still photographs and moving videos; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; accessing and downloading information from the internet; and sending, receiving, and storing GPS coordinates of a phone's location.

15.    Based on my knowledge, training, and experience, I know that cellular phones, such as the Apple iPhones described in Attachment "A," can store electronic information for long periods of time.  This information can sometimes be recovered with forensics tools.

16.    Based on my training and experience, I know that it is a common practice for drug/firearm traffickers to use and keep cellular telephones to facilitate their drug/firearm trafficking

business. Cellular telephones allow traffickers to remain in close and nearly instantaneous communication with their customers and suppliers.

17.    In my experience, it is common for cellular telephones used by drug/firearm distributors and drug/firearm users to contain evidence of drug/firearm trafficking. This evidence includes call logs, text messages, stored emails, contact lists, photographs, and video images of drugs/guns, drug proceeds, and drug/firearm trafficking paraphernalia and activity, and other information. It is also common for drug/firearm users to utilize cell phones to obtain drugs or firearms.

18.    I also know from my training and experience that the electronic memories of cell phones, including social media applications, have been found to contain evidence of illegal firearm possession, including communications regarding when and how an illegal firearm was obtained, who obtained the illegal firearm for the possessor, and the motivation for possessing the illegal firearm.

19.    I also know that people who sell or possess firearms illegally frequently take or cause to be taken photographs or other images of themselves in possession of firearms, their associates, their property, and assets with cell phones. They also frequently utilize cell phones to communicate with other individuals to purchase or sell firearms.

20.    In addition, based on my training and experience and conversations with other law enforcement officers, I know that people involved in drug/firearm trafficking communicate with each other on social media applications, such as Facebook, Snapchat, Instagram, WhatsApp, etc. I also know that individuals will oftentimes set up dates and times for "deals" on social media applications such as Facebook Messenger and WhatsApp. Based on my training and experience, I know that people are able to, and generally do, access said social media applications on their mobile devices.

## FEDERAL FIREARMS LICENSING

21.    Federal law requires any person engaged in the business of dealing in firearms to be licensed by ATF.  Persons so licensed are known as federal firearms licensees (FFLs).  Federal law requires FFLs to maintain certain records relating to the acquisition and disposition of firearms. The most common record is ATF Form 4473 ("4473"), which is used to record over-the-counter sales of firearms.  The 4473 requires the buyer of a firearm to provide his or her name, current address, and other identifying information.  The buyer must also present the FFL with a valid government-issued photo identification.

22.    The 4473 also requires the buyer to answer a series of questions related to the lawfulness of sale, including whether he or she is the actual buyer of the firearm.  The form contains a

warning in emboldened text: **"Warning: You are not the actual transferee/buyer if you are acquiring any of the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer any of the firearm(s) to you."**

23.     At the conclusion of the series of questions, the 4473 requires the purchaser of a firearm to sign his or her name and **"certify that [his or her] answers [to the questions] are true, correct, and complete."** This certification paragraph appears directly above the line where the purchaser must sign his or her name.

24.     In addition to the certification, the certification paragraph includes the following acknowledgements in emboldened text:

   a. **"I understand that answering 'yes' to [the question asking whether the buyer is the actual buyer of the firearm(s)] if I am not the actual transferee/buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law."**

   b. **"I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law."**

c. "I further understand that the repetitive purchase of firearms for the purpose of resale to predominantly earn a profit without a Federal firearms license is a violation of Federal law."

<u>**FIREARMS TRAFFICKING**</u>

25.    Historically, "firearms trafficking" has been a law enforcement term, not a legal one.  It was used to describe a number of schemes employed to move firearms from the legal market to the illegal one, to include a "straw purchase." A straw purchase is where the person who completed the 4473 (the straw purchaser) was not the actual buyer, but rather acquired the firearm on behalf of another person (the actual buyer). Straw purchases conceal the identity of the actual buyer, who is typically someone prohibited from possessing firearms and thus unable to purchase the firearm on his or her own behalf.  Another scheme individuals employ to move firearms from the legal market to the illegal one relates to dealing in firearms without a license, which is described in more detail below.

26.    More recently, though, with the passage of the Bipartisan Safer Communities Act in 2022 — and specifically, Section 12004 of that legislation, the Stop Illegal Trafficking in Firearms Act — criminal "straw purchasing" and "firearms trafficking" statutes were added to Title 18 of the United States Code as follows:

a. <u>Straw Purchasing of Firearms:</u> 18 U.S.C. § 932 makes it "unlawful for any person to knowingly purchase, or conspire to purchase, any firearm in or otherwise affecting interstate or foreign commerce for, on behalf of, or at the request or demand of any other person" who meets certain characteristics enumerated in the statute.

b. <u>Trafficking in Firearms:</u> 18 U.S.C. § 933 makes it "unlawful for any person to . . . ship, transport, transfer, cause to be transported, or otherwise dispose of any firearm to another person in or otherwise affecting interstate or foreign commerce, if such person knows or has reasonable cause to believe that the use, carrying, or possession of a firearm by the recipient would constitute a felony" or to "receive from another person any firearm in or otherwise affecting interstate or foreign commerce, if the recipient knows or has reasonable cause to believe that such receipt would constitute a felony."

**27.** To identify firearms trafficking schemes, ATF analyzes traces of firearms recovered in crimes, "multiple sales" reports (FFLs are required to report the sale of two (2) or more handguns to a single buyer in a five (5)-day period), and other law enforcement data to look for common firearms trafficking indicators. These indicators include firearms recovered

("recoveries") with a short "time-to-crime" (the length of time between the sale of the firearm and its recovery by law enforcement), traces of firearms sold as part of a multiple sale, frequent or repetitive purchases of the same or similar firearms, or firearms reported stolen soon after purchase (to conceal the link between the trafficker and the buyer of the firearm in case it is recovered in a crime).

**28.** Further, firearms traffickers can be prosecuted using a number of other statutes that make their underlying conduct illegal. For example:

    a. <u>Making False Statements</u>: 18 U.S.C. § 922(a)(6) prohibits knowingly making a false statement to an FFL in connection with the acquisition or attempted acquisition of a firearm, or furnishing any false, fictitious, or misrepresented identification, intended or likely to deceive the FFL with respect to any fact material to the lawfulness of the sale.

    b. <u>Providing False Information</u>: Similarly, 18 U.S.C. § 924(a)(1)(A) prohibits knowingly making a false statement with respect to information required to be kept in an FFL's records (such as a person's name, current address, or the identity of the actual buyer of a firearm).

10

c. <u>Conspiracy</u>: 18 U.S.C. § 371 makes it a crime to conspire to commit an offense against the United States.

## <u>DEALING IN FIREARMS WITHOUT A LICENSE</u>

**29.**    18 U.S.C. § 922(a)(1)(A) makes it unlawful to willfully "engage in the business" of dealing in firearms without a license. Under federal law, a person engaged in the business of dealing in firearms is "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms."   18 U.S.C. § 921(a)(21)(C).   Conducting business "to predominantly earn a profit" "means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." 18 U.S.C. § 921(a)(22).   Federal law explicitly exempts persons "who make[] occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sell[] all or part of [their] personal collection of firearms."   18 U.S.C. § 921(a)(21)(C).

**30.**    Federal law does not establish a "bright line" rule for when a license is required; there is no specific threshold number or frequency of sales, quantity of firearms, or amount of profit or time invested that triggers the licensure requirement. Instead, determining whether someone is "engaged in the business"

11

of dealing in firearms is a fact-specific inquiry into factors such as whether the person represents him- or herself as a source of firearms; whether he or she repetitively buys and sells firearms; the timing and circumstances under which the person is selling firearms; and whether he or she intends to earn a profit. No single factor is determinative, and the relative importance of any of the factors will vary depending on the facts and circumstances applicable to the individual seller.

31.    For instance, it is relevant whether a person represents him- or herself as a source of firearms, whether he or she takes orders or obtains specific firearms for buyers, whether he or she offers to buy firearms to immediately resell, whether he or she repetitively acquires and resells firearms in unopened, original packaging, or in new condition, and what price or fees he or she charges for firearms.  Courts have found that even a few firearm transactions, when combined with other evidence, can be sufficient to establish that a person is "engaged in the business" of dealing in firearms.  For example, courts have upheld convictions for dealing without a license when as few as two firearms were sold, or when only one or two transactions took place.

32.    Based on my knowledge, training, and experience, I know that firearms traffickers often utilize cellular and other electronic devices, and social media and other applications and

other photographic and written records contained within such devices, to communicate with other persons to acquire, facilitate the purchase, sale, or transport of, and/or otherwise traffic such firearms.

## **PROBABLE CAUSE**

**33.** On April 7, 2023, CPD Special Enforcement Unit (SEU) Detectives received information from a confidential informant (CI) in reference to an individual later identified as Curon Cameron CORDON, who was suspected to be selling fentanyl pills in the area of Charleston, WV. CORDON was originally known to the CI as "B-Dai," and he told the CI that he was on YouTube as "yg bdai." An open-source Facebook search for "Yg Bdai" located an account associated with CORDON. CORDON was later positively identified as the target of the investigation by comparing photographs on his social media pages, CPD mugshots for CORDON, and evidence gathered during this investigation, including video recordings of controlled purchases.

**34.** Also on April 7, 2023, CPD SEU Detectives utilized a CI to conduct a controlled purchase of five (5) suspected fentanyl pills from an individual later identified as Jesus Emmanuel DAVIS in exchange for $125 of pre-recorded United States Currency. DAVIS delivered the suspected fentanyl pills to the CI at the direction of CORDON. The CI contacted CORDON at CORDON's cell phone number to set up this deal.

13

**35.** On April 13, 2023, CPD SEU Detectives utilized a CI to purchase from CORDON five (5) suspected fentanyl pills and one (1) suspected alprazolam pill in exchange for $125 of pre-recorded United States Currency. The CI again contacted CORDON via CORDON's cell phone to set up this deal. During the controlled purchase, CORDON advised that he primarily sells marijuana and firearms and asked the CI if the CI knew anyone willing to purchase a firearm. The CI told CORDON that the CI was a felon and was looking for a firearm. CORDON also stated he travels back and forth from New York to conduct business.

**36.** On April 20, 2023, CPD SEU Detectives utilized a CI to purchase from CORDON three (3) suspected fentanyl pills in exchange for $125 of pre-recorded United States Currency. The CI contacted CORDON via his cell phone to set up this deal. During the controlled purchase, the CI met CORDON outside a business on Railroad Avenue in Charleston, Kanawha County, WV. CORDON gave the CI the pills and instructed the CI to give the money for the pills to a female sitting in the passenger's seat of a red Kia Sportage (bearing WV registration 66Z727, registered to Maia MARTISKO) that was parked nearby. CORDON also informed the CI that he could sell the CI an assault-style rifle for $900.

**37.** On May 3, 2023, CPD SEU Detectives utilized a CI to purchase from CORDON four (4) suspected fentanyl pills and three (3) firearms in exchange for $1,000 of pre-recorded United States

Currency. Again, the CI contacted CORDON via his cell phone to arrange the deal. During the controlled purchase, the CI met CORDON outside a business on Railroad Avenue in Charleston, Kanawha County, WV. Upon arriving at the business, CORDON was waiting for the CI inside a red Kia Sportage, which appeared to be the same vehicle present during the April 20, 2023 controlled purchase. When the CI got inside the vehicle, CORDON handed the CI the pills and a case containing a Taurus, Model G2C, 9mm handgun, SN: TLX72482, and a Taurus, Model Spectrum, .380 caliber handgun, SN: F165288. CORDON then drove the CI to a residence on Highland Drive, Charleston, Kanawha County, WV, where he went inside and emerged with a Kimber, Model Micro 9, 9mm handgun, SN: PB0086902, which he gave to the CI.

**38.** On May 11, 2023, CPD SEU Detectives utilized a CI to purchase from CORDON four (7) suspected fentanyl pills and a Smith & Wesson 9mm pistol, SN: FYS2272, in exchange for $700 of pre-recorded United States Currency. The CI contacted CORDON via his cell phone to set up this deal. The CI met CORDON outside a business on Railroad Avenue in Charleston, Kanawha County, WV. The CI got into the passenger's seat of a rental car CORDON was driving. CORDON then gave the CI the firearm and drove the CI to 605 Market Drive, Charleston, Kanawha County, WV 25302, where he went inside alone to obtain the suspected fentanyl pills for the CI.

**39.**     On May 17, 2023, CPD SEU Detectives and members of the
ATF utilized a CI to purchase from CORDON ten (10) suspected
fentanyl pills and three (3) firearms in exchange for $3,000 of
pre-recorded United States Currency. The CI contacted CORDON via
his cell phone to set up this deal. During the controlled
purchase, the CI called CORDON on his cell phone to tell CORDON
where to pick the CI up. A short time later, CORDON and his
girlfriend, Maia MARTISKO, arrived at the agreed-upon location in
a rental car. CORDON and MARTISKO then provided the CI a box
containing a Ruger, Model LCP, .380 caliber pistol, SN: 372494946,
and a NAA, Model Mini LR, .22 caliber revolver, SN: L264741.
CORDON then drove the CI and MARTISKO to 605 Market Drive,
Charleston, Kanawha County, WV 25302 to obtain the pills, which
he handed to the CI upon returning to the vehicle.

**40.**     After the CI received the two (2) firearms and the pills
from CORDON and MARTISKO on May 17, 2023, CORDON drove the CI and
MARTISKO to South Charleston, Kanawha County, WV to obtain the
third firearm. During the drive, CORDON explained that he obtained
guns by paying a female named "Kayla B" cash to support her drug
habit in exchange for her purchasing the guns from FFLs.
According to the 4473 for the two (2) firearms in the box CORDON
and MARTISKO handed the CI on May 17, 2023, the firearms were
purchased by Kayla Brooke MCCALLISTER from FFL Spring Hill Rod
and Gun, 4961 MacCorkle Avenue Southwest, South Charleston,

16

Kanawha County, WV 25309, telephone number 304-768-2090, on May 12, 2023.

**41.**     After CORDON, MARTISKO, and the CI arrived in South Charleston, Kanawha County, WV, to obtain the third firearm on May 17, 2023, CORDON communicated with MCCALLISTER for status updates regarding MCCALLISTER's purchase of the third firearm. For instance, MCCALLISTER told CORDON that she was going inside the store to make the purchase and, later, that the store was completing the paperwork for the purchase.   CORDON also told MCCALLISTER via text message to meet them at a nearby Dollar General store after she had purchased the firearm. There is probable cause to believe that these communications occurred via cell phone.

**42.**     On May 24, 2023, CPD SEU Detectives and members of the ATF utilized a CI to purchase from CORDON fifteen (15) suspected fentanyl pills and a firearm, in exchange for $1,000 of pre-recorded United States Currency.   The CI contacted CORDON via his cell phone to set up the deal. During the controlled purchase, the CI met CORDON outside a business on Railroad Avenue, Charleston, Kanawha County, WV, and got into a vehicle CORDON was driving. CORDON gave the CI a Smith & Wesson, Model SD40, .40 caliber pistol, SN: FDX2075. A review of records at FFL KV Jewelry and Loan, 6 Dunbar Avenue, Dunbar, Kanawha County, WV 25064, revealed this firearm was purchased by MCCALLISTER on May 22,

2023. CORDON then drove the CI to 605 Market Drive, Charleston, Kanawha County, WV 25302 to obtain the pills.

**43.**     On May 31, 2023, CPD SEU Detectives and members of the ATF utilized a CI to purchase from CORDON thirteen (13) suspected fentanyl pills and a firearm, in exchange for $1330 of pre-recorded United States Currency. Again, the CI contacted CORDON via his cell phone to arrange the purchase. The CI met CORDON and MARTISKO outside a business on Railroad Avenue, Charleston, Kanawha County, WV. The three of them got into a black sedan, and CORDON drove them to 605 Market Drive, Charleston, Kanawha County, WV 25302. Once they arrived, CORDON handed the CI a Glock Model 19, 9-mm caliber pistol, SN: BKVD571. A review of records at FFL KV Jewelry and Loan revealed this firearm was purchased by MCCALLISTER on May 30, 2023. CORDON then entered the residence, obtained the suspected fentanyl pills, and returned to the vehicle with the CI and MARTISKO.

**44.**     CORDON proceeded to leave the residence and began driving east on Market Drive, Charleston, Kanawha County, WV. While driving, CORDON used his cell phone to make a phone call to an unidentified subject and asked if the subject had any powder fentanyl ready. CORDON then drove back to 605 Market Drive, Charleston, Kanawha County, WV 25302 and entered the residence, again leaving the CI and MARTISKO inside the vehicle. CORDON returned to the vehicle with two plastic bags of what CORDON said

18

was powder fentanyl. CORDON gave the CI a small amount of the substance and indicated that he would take the rest to Huntington, Cabell County, WV to sell.

**SEARCH OF 605 MARKET DRIVE, CHARLESTON, KANAWHA COUNTY, WV 25302**

**45.**   On June 8, 2023, CPD SEU Detectives and members of the ATF executed a state search warrant at 605 Market Drive, Charleston, Kanawha County, WV 25302. DAVIS and an individual identified as Jomo SMITH were arrested on charges of narcotics distribution. The following items were seized during the execution of the search warrant:

> **a.** approximately 434 grams of suspected powder fentanyl;
>
> **b.** approximately 95 suspected fentanyl pills;
>
> **c.** approximately 27 grams of suspected marijuana; and
>
> **d.** a Charter Arms, Model Undercover, .38 Special revolver, SN: 21L08874.

**ARREST AND INTERVIEW OF CORDON AND MARTISKO**

**46.**   Also on June 8, 2023, members of the Huntington Police Department (HPD) and ATF executed state arrest warrants for CORDON and MARTISKO in Huntington, Cabell County, WV. On that date, officers were conducting surveillance in the area of 1629 8th Avenue, Huntington, Cabell County, WV 25703, an apartment where CORDON was believed to reside because he had been seen entering and/or leaving on previous occasions. Officers observed CORDON exit the residence and begin standing next to a red Kia Sportage

(bearing WV registration 66Z727, registered to MARTISKO). This is the same vehicle CORDON drove during the controlled purchases on April 20, 2023, and May 3, 2023. Officers approached CORDON and placed him in custody. Officers also located MARTISKO outside of the residence and placed her under arrest. CORDON and MARTISKO were both taken to the Huntington Police Department for processing.

47.     Following his arrest, CORDON provided a Mirandized statement to investigators. During the interview, CORDON advised he had a Hi-Point rifle in his apartment at 1629 8th Avenue, Huntington, Cabell County, WV 25703. CORDON stated he had lived at the apartment for approximately four (4) months. CORDON also informed investigators that he had possessed and sold numerous firearms in the past. Additionally, CORDON stated that he smoked marijuana every day and had been doing so for a long period of time.

**SEARCH OF MARTISKO'S VEHICLE AND CORDON'S APARTMENT**

48.     Upon approaching the red Kia Sportage (bearing WV registration 66Z727, registered to MARTISKO) parked outside CORDON's apartment, officers observed a bud of suspected marijuana in plain view in the center console. Due to the suspected marijuana observed in plain view, officers conducted a search of the vehicle.

49.     During the search of the vehicle, officers located a red Apple iPhone in a black case with a "2BG Entertainment" sticker on the back in the driver's seat. I know CORDON to be a rapper who is

a part of 2BG Entertainment. CORDON has "2BG" tattooed on his chest.

50.     Officers also found a cracked, black in color Apple iPhone and a cracked, white in color Apple iPhone in a small compartment in the center of the vehicle. Based on my training and experience, I know that those who traffic narcotics and firearms frequently possess more than one cellular device for communications with their sources and suppliers.

51.     The three Apple iPhones mentioned in the preceding paragraphs are described in more detail in Attachment "A."

52.     Officers obtained a state search warrant for CORDON's residence. While executing the search warrant, officers seized a Hi-Point 45ACP rifle, SN: R63088, with an empty magazine. Officers also found empty hard plastic boxes for a Glock, Model 19, 9mm pistol, SN: BKVD571, and a Glock, Model 19X, 9mm pistol, SN: BKRO278, as well as miscellaneous ammunition. Records indicate that on May 30, 2023, MCCALLISTER purchased a Glock, Model 19, 9mm pistol, SN: BKVD571, from FFL KV Fine Jewelry & Loan in Dunbar, Kanawha County, WV. The serial number for the Glock pistol purchased by MCCALLISTER matched the serial number on one of the above-mentioned empty hard plastic Glock boxes recovered from CORDON's residence. To date, neither of these firearms has been recovered as part of this investigation.

## SUMMARY OF PROBABLE CAUSE

**53.**     Given the previously noted information, it is clear that CORDON was acting along with others to facilitate the trafficking of both firearms and narcotics, specifically fentanyl. As detailed in paragraph 41 of this Affidavit, CORDON communicated with MCCALLISTER via cell phone to facilitate firearms trafficking, and as detailed in paragraph 44 of this Affidavit, CORDON communicated via cell phone with an unidentified subject to obtain fentanyl to sell in Huntington, Cabell County, WV. As described in more detail in paragraph 58 of this Affidavit, this data may remain on a cell phone for weeks, months, or even years, and even if the user deletes the data. Accordingly, there is probable cause to believe these communications may still be stored on the Apple iPhones identified in Attachment "A."

**54.**     CORDON and the CI communicated via text message and voice call to arrange the controlled buys described in paragraphs 33 through 44 of this Affidavit. CORDON utilized both voice calls and text messages to communicate with the CI in reference to the trafficking of both narcotics and firearms.  As described in more detail in paragraph 58 of this Affidavit, this data may remain on a cell phone for weeks, months, or even years, and even if the user deletes the data. Accordingly, there is probable cause to believe these communications may still be stored on the Apple iPhones identified in Attachment "A."

22

**55.** CORDON's involvement in drug/firearms trafficking and his use of a cell phone to facilitate those crimes establish probable cause to believe that the Apple iPhones described in Attachment "A" contain evidence of drug/firearm trafficking. Additionally, an open-source search of various social media platforms showed that CORDON has a Facebook account in his own name, an Instagram account under the handle "200don," with a listed name of "YG Bdai," and a TikTok account under the handle "YG Bdai." CORDON also has a YouTube account under the name of "YG Bdai." As stated above, based on my training and experience, as well as communication with other law enforcement officers, I know that individuals involved in drug/firearms trafficking often use social media to communicate with their customers and sources of supply and arrange distribution. Therefore, there is probable cause to search the social media applications located on the iPhone described in Attachment "A" for the electronically stored information identified in Attachment "B."

## CUSTODY OF THE CELLULAR TELEPHONE

**56.** As described in more detail in paragraphs 49 and 50 of this Affidavit, the three Apple iPhones described in Attachment "A" were seized from the red Kia Sportage (bearing WV registration 66Z727, registered to MARTISKO) that was parked in front of CORDON's residence. After the phones were seized, they were taken to the Huntington Police Department, where they were logged into

evidence. On June 22, 2023, HPD Detective Rosario turned the phones over to Your Affiant, who placed the phones in evidence at the CPD SEU Office until the phones were logged into ATF custody.

57.     In my training and experience, I know that the Apple iPhones described in Attachment "A" have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the phones first came into the possession of law enforcement.

**NATURE OF THE EXAMINATION**

58.     There is probable cause to believe that evidence that was once stored on the Apple iPhones described in Attachment "A" may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is because when a person "deletes" a file on a cell phone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

24

    **b.** Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space for long periods of time before they are overwritten. "Free space" or "slack space" refers to space on the storage medium that is not currently being used by an active file. Additionally, a cellular phone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    **c.** Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory, or "cache."

**59.** As further described in Attachment "B," this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Apple iPhones described in Attachment "A" were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Apple iPhones described in Attachment "A" because:

    **a.** Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium

that can reveal information such as online nicknames and passwords.

b. Forensic evidence on a device can also indicate who has used or controlled the device.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, it is sometimes necessary to establish that a particular item is not present on a storage medium.

60.   Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for would permit the examination of the devices consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

61.   Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a

premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

**62.** Based on my training, education, experience, and discussions with other trained investigators, I know that persons who sell or possess drugs and/or firearms frequently take or cause to be taken photographs or other images of themselves, their associates, their property, and assets with cellular phones. Persons who sell drugs and/or firearms communicate with each other via cellular phones while transporting drugs, firearms, and currency. They also utilize cellular phones to discuss criminal activity before, during, and after a particular criminal act.

**63.** Based on my training, education, experience, and discussions with other trained investigators, I also know that most drug/firearm traffickers are like any other individuals in our society, in that they maintain certain records on their cellular telephones. These records will normally be retained for long periods regardless of whether their value to the individual has diminished. This type of evidence is often generated, maintained, and subsequently forgotten about. Hence, records maintained in cellular phones, that one would normally think a prudent person would destroy because of their incriminating nature, are still possessed months or even years after they came

into the possession of the drug/firearm trafficker. Some individuals do not even realize the incriminating nature of the records they keep, including e-mails, text messages, and photographs.

**64.** Based on my training and experience, and the facts set forth above, I believe there is probable cause that evidence of criminal violations of federal law, including but not limited to violations of 18 U.S.C. § 922(a)(6) (Making False Statements); 18 U.S.C. § 922(g)(3) (Possession of a Firearm by a Person Who Is an Unlawful User of or Addicted to Controlled Substances); 18 U.S.C. § 924(a)(1)(A) (Providing False Information); 18 U.S.C § 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense); 18 U.S.C. § 932(b) (Straw Purchase of Firearms); 18 U.S.C. § 933 (Trafficking in Firearms); 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance); and 18 U.S.C. § 371 (Conspiracy), will be found on the Apple iPhones described more completely in Attachment "A."

**65.**     WHEREFORE, your Affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the Apple iPhones described in Attachment "A" to seek the items described in Attachment "B."


Further your affiant sayeth naught.

*Wyatt Lee McCabe*
_____
Wyatt McCabe
Task Force Officer, ATF



Sworn to by the affiant telephonically in accordance with the procedures of Rule 4.1 of the Federal Rules of Criminal Procedure this the 26th day of July, 2023.

_____
DWANE L. TINSLEY
United States Magistrate Judge